**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **Case No. 8:08CR350** |
| **Plaintiff,** | ) | |
| **vs.** | ) | **REPORT AND RECOMMENDATION** |
| **JESUS URIBE ROBLES,** | ) | |
| **Defendant.** | ) | |

This case is before the court on the defendant's MOTION TO SUPPRESS BASED ON SEIZURE OF LUGGAGE, WALLET, AND PERSON (#12) and MOTION TO SUPPRESS STATEMENTS (#13). Hearing on the motions was held March 18 and 30, 2009. The transcript (#31) of the March 18, 2009 hearing was filed on March 24, 2009 and the transcript (#42) of the March 30, 2009 hearing was filed on April 17, 2009, at which time the matter was deemed submitted.

For the reasons discussed below, I recommend that both motions be denied.

## I. FACTUAL BACKGROUND

### A. Jason Scott

Jason Scott testified that he is employed by the Nebraska State Patrol as an investigator assigned to the commercial interdiction unit. On July 31, 2008 at approximately 5:00 A.M. while on duty at the Greyhound bus depot in downtown Omaha (#31, 63:17-24), Scott observed Greyhound's baggage handlers open the cargo doors of a bus and begin to sort luggage. One of the pieces of luggage drew his attention because it appeared to be brand new (64:16-22). Scott read the luggage tag and noted the luggage was coming from El Monte, California which he knew to be a source city for drugs (#31, 64:24-65:1). He further observed that it was the only bag checked by the named passenger. Through

his training and experience in hundreds of cases, Scott knew that people often purchase a new bag at the last minute to transport contraband (#31, 65:15-22).

Scott testified that he moved the bag nearer the door of the bus so that everyone re-boarding the bus would have a view it and potentially claim it. Scott then observed a person, later identified as the defendant, Jesus Uribe Robles, approach the bag and put his hands on it (#31, 67:19-22). Robles picked up the bag, examined the tag and moved it back to the area of the cargo doors. Scott approached Robles and asked him in English if the bag was his. Robles responded in English (#31, 68:13-22).

At the time Scott contacted Robles, he was dressed in plain clothes, jeans and a t-shirt. Scott was carrying his weapon but it was not visible (#31, 69:8-18). Scott identified himself to Robles as a police officer and showed his credentials. He explained that he was with local law enforcement and that Robles was not under arrest. Scott asked Robles if he could borrow a minute of his time (#31, 70:3-10). Robles acknowledged that he would speak with Scott, and Scott asked Robles where he was coming from. Robles answered, California. Scott asked Robles if the bag he had moved was his. Robles denied ownership, stating no that it was not his (#31, 70:23-71:2). Scott then asked if he had ID and Robles produced a Mexican driver's license. Scott noted the name on the Mexican driver's license did not match the name on the bag tag (#31, 71:3-14). Scott asked Robles if he had a bus ticket. Robles answered yes, but he had given it to the bus driver (#31, 71:9-22). Based on Scott's experience working the bus station and his familiarity with ticketing, he knew that when people get off the bus who are going to re-board it, they do not have their ticket collected by Greyhound employees, so Scott was suspicious about Robles' answer (#31, 72:4-73:3).

Scott testified that as he watched Robles retrieve his Mexican driver's license from his wallet, Robles held his body away from Scott and held the wallet in a position so that Scott could not see inside. However, as Robles pulled the driver's license from the wallet, Scott noticed a California ID card behind the license. Scott asked Robles if he could search the wallet (#31, 73:4-13). Robles handed the wallet to Scott and Scott began to look through it to locate the California ID card. At that time Robles ran off in a northwest direction from the bus. Scott chased Robles (#31, 73:20-74:12).

Scott caught up with Robles and grabbed him in an attempt to bring him under control. Robles then stated, "no, no, no, I can't go to jail, my wife is having a baby" (#31, 75:2-4). Scott yelled for "Al" in an attempt to get the attention of the inspector, Alan Eberle. After Eberle arrived Robles was handcuffed (#31, 75:13-23). Scott commented that it was silly for Robles to run, and Robles told the officers that he ran because he had warrants in California (#31, 75:24-76:9, 76:1-14).

Eberle walked Robles to a back room of the bus depot where Eberle *Mirandized* him using a *Miranda* card (#31, 77:8-17). Eberle then asked Robles if he understood his rights and if he was willing to speak. Robles responded, "yes" (#31, 77:13-20). Scott testified that Robles was very cooperative and that before being read his rights, Robles made several "spontaneous utterances" incriminating himself (#31, 79:3-7).

Scott testified that he questioned Robles, after Robles was read his *Miranda* warnings, by asking what was in the suitcase and why he ran. Robles responded that Scott should open the suitcase and find out, further explaining that he had been paid $2,000 to transport the bag from California to Des Moines (#31, 80:1-11). Scott then watched as investigator Eberle opened the suitcase and field tested some of its contents.

Scott continued his contact with Robles in an attempt to find out what Robles' level of cooperation might be. It was determined that since the level of cooperation was unknown that they should move to the state patrol offices for further questioning.

Scott testified that once at the patrol offices he and other members of the state patrol were joined by agent Paul Orduna of the DEA. While at the patrol office, Robles was again read his rights, this time in Spanish (Ex. 101) by Special Agent Orduna (#31, 83:17-22). Scott admitted that while at the patrol office Orduna spoke to Robles in Spanish, while Scott continued to talk to Robles in English (#31, 83:2-22).

On cross-examination Scott admitted that he did not include the fact that Robles had stated that his wife was having a baby and that he could not go to jail, in his written report (Ex. 102) (#31, 86:1-23). Scott also stated that based upon his contact with Robles and other Spanish-speakers, he thought Robles' English was pretty good (#31, 88:15-20). Scott also testified that when he first contacted Special Agent Orduna, he did not believe he had made a specific point that Robles was a Spanish speaker (#31, 91:12-20). **.B**

**Alan Eberle**

Alan Eberle testified that he is employed by the Nebraska State Patrol as an investigator and canine handler working with the commercial interdiction unit. On July 31, 2008 while working at the Omaha Greyhound bus depot, he first came in contact with the defendant, Jesus Robles Robles, when Robles was struggling with investigator Jason Scott on the west side of the bus depot in a parking lot. Eberle aided investigator Scott in taking physical control of Robles and placing him in handcuffs (#31, 35:8-21). Eberle then joined Scott and Robles, after picking up a suitcase from near the bus that was identified by Scott as belonging to Robles (#31, 36:1-9). Once inside the office at the bus depot, Eberle

overheard Scott give Robles his *Miranda* warnings in English, although Eberle did not hear the entire conversation between Scott and Robles as he was distracted by contact with another passenger unrelated to Robles (#31, 39:5-40:6).

Eberle testified that after he was informed by Scott that the bag could be searched, he opened the bag and located an X-Box gaming console. On removing the console from the bag, he noted that it was heavier than a normal X-Box gaming system, which raised his suspicions (#31, 41:3-13). He also noted that the X-Box had recent tool marks on the screws near the bottom, and after he unscrewed the bottom and opened the X-Box he observed vacuum-sealed bundles of white crystal-like substances which were later determined to be methamphetamine (#31, 42:2-9).

On cross-examination Eberle testified that while he was on the bus he first heard the words, "hey, Al" and looked over his shoulder to the front of the bus where he saw investigator Scott and Robles (#31, 48:8-15). Eberle estimated that Scott and Robles were about 30 yards from the bus (#31, 49:12-19), and investigator Scott was tied up with Robles and they were spinning circles (#31, 50:5-8). Eberle testified that when Robles was taken into custody, the driver of the bus was not in the driver's seat but that several of the passengers had already re-boarded the bus (#31, 54:2-55:1).

On redirect examination, Eberle testified that on occasion he has prevented a bus from departing the bus station if he has someone in custody and feels that there may be additional items of evidence aboard the bus (#31, 58:15-23).

**C. Richard Lutter**

Investigator Richard Lutter testified that he is employed by the Nebraska State Patrol currently assigned to the commercial interdiction narcotics investigation unit. On

July 31, 2008 he was on duty at the Omaha Greyhound bus depot when he had contact with the defendant, Jesus Robles Robles, by assisting with the handcuffing of Robles (#31, 20:17-24). Lutter, along with investigators Scott and Eberle and defendant Robles, then went to an office in the bus terminal where Lutter overheard parts of the conversation between Scott and Robles. Lutter noted that he observed Robles sitting on a chair at the end of the hallway and he heard Scott speaking to Robles in English (#31, 21:14-24). Because Lutter was conducting another investigation on a third party, he did not hear any of the specifics of the conversation (#31, 21:25-22:7). Lutter testified that he did not search Robles's bag, but did handle the X-Box 360 game and observed two bags in the game console. One of the bags contained a white granular substance which he believed to be a cut-product used to dilute a controlled substance and the other contained a controlled substance believed to be methamphetamine (#31, 23:7-21).

On cross-examination Lutter again testified he could not specifically testify about the conversation between investigator Scott and defendant Robles (#31, 25:4-7).

**D. Steven Rasgorshek**

Steven Rasgorshek testified that he is an employee of the Nebraska State Patrol currently assigned to the investigative service drug division commercial interdiction unit. He testified that he was not on duty during the day of the Robles arrest, but did have information about how the drug interdictions are conducted at the bus depot. He is aware that there have been times when law enforcement have prevented a bus from departing the depot (#31, 11:19-23), when law enforcement have located some drugs or have an individual in custody to make sure there are no other individuals or additional property on the bus (#31, 11:23-12).

**E. Kathy Mosiman**

Kathy Mosiman testified that she is a 10-year employee of Greyhound Bus lines, currently serving as the manager of the Greyhound bus station at 1601 Jackson in Omaha, Nebraska. During her employment she has interacted at the bus depot with police officers involved with drug interdiction on more than 10 but less than 100 occasions (#42, 12:5-13).

Mosiman testified she has witnessed drug interdiction officers speak directly to passengers in the lobby, on the platform, by the buses, and in the back baggage area (#42, 16:3-8), but she has never observed anyone being questioned by police in the baggage area when the bus driver is looking for a passenger (#42, 17:11-14). On occasion she has observed bus drivers looking for a passenger for re-boarding and on occasion the driver will approach the ticket counter and request that a Greyhound employee make an announcement of the name of a missing person. Greyhound employees will also check the restrooms and go outside the station to locate anyone who did not hear the announcement (#42, 19:6-16). On the occasions when the missing passenger is being talked to by police, Greyhound employees will so inform the driver and the driver will wait (#42, 20:12-20). Mosiman noted that there are times when she has observed the interdiction officers approach a bus driver and tell the driver that officers were talking to a passenger (#42, 21:15-19), but she is not usually close enough to overhear the actual conversation (#42, 21:20-22:1). To the best of her recollection, a bus driver will typically wait for the missing passenger (#42, 22:18-21).

On cross-examination Mosiman testified that during her work at the bus depot she has observed approximately 15 incidents when a driver held the bus in response to a police officer's request (#42, 23:14-23).

**F. Recorded Interview (Exhibit 102)**

The court has reviewed the video recording of the interview conducted at the Nebraska State Patrol Office on July 31, 2008. The video shows that Robles was able to speak and understand English fairly well; however, he was given a Spanish language waiver of rights advisory form and was asked to read it. The video depicts Robles taking and appearing to read the document, reading the document out loud, and signing it. Robles appeared to speak English fairly well, and he spoke in both English and Spanish during his time with the officers.

## II. ISSUES PRESENTED

In summary, defendant Robles contends all physical evidence and statements should be suppressed due to violations of his rights under the Fourth, Fifth and Sixth Amendments to the U.S. Constitution because (1) he was detained by law enforcement in a manner amounting to an arrest without a warrant, probable cause, or reasonable suspicion; (2) his property was seized without a warrant and without his consent; and (3) he was not timely advised of his *Miranda*[1] rights and his statements were not freely and voluntarily made. At the court's request, counsel also filed supplemental briefs addressing the issue of whether the defendant abandoned the property before it was searched.

## III. LEGAL ANALYSIS

**A. Officers' Initial Encounter with Robles**

Encounters between the police and citizens fall into three general categories: (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Amendment, *see, e.g., Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, *see, e.g., Terry v. Ohio*, 392 U.S.1 (1968); *Reid v. Georgia*, 448 U.S. 438 (1980); *United States v. Sokolow*, 490 U.S. 1 (1989); and (3) physical arrests, which must be supported by probable cause. *See generally United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir.), *cert. denied*, 540 U.S. 962 (2003).

"There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case." *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998); *see also United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). "'A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area ....'" *Id.* (quoting *United States v. White*, 81 F.3d 775, 779 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996)). This is true even if the officer has no suspicion that the individual may be engaged in criminal activity. *See United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). Some circumstances bearing on the question of consent include whether the officers positioned themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation. *United States v. Griffith*, 533 F.3d at 983.

I find that Investigator Scott's initial contact and conversation with defendant Robles did not constitute a seizure within the meaning of the Fourth Amendment. Scott approached Robles, identified himself as a police officer and told Robles he was not in any kind of trouble or under arrest. Scott was dressed in plain clothes with no weapon displayed. While other officers were in the general area, they did not make their presence known to Robles at that time. I find credible Investigator Scott's testimony that Robles voluntarily agreed to talk to Scott outside the bus station, provided identification and ticket information, answered questions about his travel itinerary and ownership of the bag, and that he voluntarily gave his wallet to Scott.

**B. Seizure of Robles' Person**

I also find, based on the totality of the circumstances, that officers were warranted in expanding the scope of this encounter to a *Terry* stop after defendant Robles turned and ran away upon giving his wallet to Investigator Scott. Robles was already of interest to Scott because of his association with the suspect luggage and Scott's observation of the California ID card while Robles was retrieving his driver's license from his wallet. "Headlong flight–wherever it occurs–is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

**C. Seizure of Property**

Considering the factors discussed in Section A, above, the court finds that defendant Robles was not coerced, and voluntarily gave his wallet to Investigator Scott so that Scott could look at the wallet's contents.

Turning to the item of luggage, the court finds that the item was ultimately abandoned. "A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Tugwell*, 125 F.3d 600, 602 (1997), *cert. denied*, 522 U.S. 1061 (1998); *accord* *United States v. James*, 353 F.3d 606, 615-16 (8th Cir. 2003). Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent. *Tugwell*, 125 F.3d at 602. The determination of abandonment "'is to be made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of the property.'" *Id.* (quoting *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986)). The court may consider only the information available to the officers at the time of the search. *Id.*

When this particular bag was seized and searched by law enforcement, the officers knew that the name on Robles' Mexican driver's license did not match the name on the bag tag, Robles had denied ownership of the bag during his initial conversation with Scott, and Robles had actually fled on foot from the bus station. Considering the totality of the circumstances, the court finds that the luggage was abandoned.

Nor is there merit to the defendant's complaint that Investigator Scott unlawfully seized the luggage by moving it nearer the door of the bus so that people boarding the bus could see it and potentially claim it.

> Courts must focus on three factors when considering whether law enforcement's interference with checked luggage constitutes a seizure. First, did law enforcement's detention of the checked luggage delay a passenger's travel or significantly impact the passenger's freedom of movement? Second, did law enforcement's detention of the checked luggage delay its timely

> delivery? Third, did law enforcement's detention of the checked luggage deprive the carrier of its custody of the checked luggage? If none of these factors is satisfied, then no Fourth Amendment seizure has occurred. Conversely, if even a single factor is satisfied, then a Fourth Amendment seizure has occurred.

*United States v. Va Lerie*, 424 F.3d 694, 707 (8th Cir. 2005), *cert. denied*, 548 U.S. 903 (2006). The officer's act of moving the luggage nearer to the door of the bus did not affect Robles' freedom of movement, delay its timely delivery, or deprive anyone of custody of the luggage. No Fourth Amendment seizure occurred at that time.

**D. Statements; *Miranda* Warnings**

The protections of *Miranda v. Arizona* are triggered when an individual is (1) in custody and (2) being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

For the reasons explained above, the court finds that the defendant was not "in custody" until he ran away from Investigator Scott. Any statements made prior to that time were not the product of custodial interrogation, were voluntarily made, were not subject to *Miranda*, and should not be suppressed.

The statements made by the defendant as he was being handcuffed (that he couldn't go to jail because his wife was having a baby, and that he ran because he had warrants in California) were volunteered, and should not be suppressed.

The record shows that defendant Robles was given his *Miranda* rights at the bus depot and again at the state patrol offices before any interrogation took place. I find that the defendant understood his rights, and, knowing his rights, agreed to talk to the investigating officers without an attorney present. As to voluntariness, there is no evidence showing that the defendant's will was overborne, or that he was otherwise coerced, deceived, or promised anything in return for waiving his *Miranda* rights. *See United States v. Syslo*, 303 F.3d 860, 865-66 (8th Cir. 2002) (To determine whether a waiver was voluntary, the court considers the totality of the circumstances and must determine whether the individual's will was overborne.); *see also United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002); *United States v. Dehghani*, 550 F.3d 716, 719-20 (8th Cir. 2008).

**IV. RECOMMENDATION**

For the reasons given above,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS BASED ON SEIZURE OF LUGGAGE, WALLET, AND PERSON (#12) and MOTION TO SUPPRESS STATEMENTS (#13) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation.

**DATED May 15, 2009.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**